Hooker, Corser & Mitchell Company, Plaintiff, *v.*
Maude E. Hooker and James F. Hooker, Defendants.

(Supreme Court, Schenectady Trial Term, March, 1918.)

Gifts — right to legally make — husband and wife — when gift to wife upheld — deeds — evidence — fraud — real property.

> A man may legally make a gift of a home to his wife if at the time he has other property sufficient to pay his debts and the amount devoted to the home is reasonable in view of his then means.

> A grant of real estate to a wife for a valuable consideration paid by her husband is presumed fraudulent as to his then existing creditors and, in an action to charge the property with the payment of a judgment recovered against him and others seven years after said conveyance in an action commenced prior thereto, the burden is upon him to disprove a fraudulent intent.

> Where the evidence in such an action tends strongly to corroborate the defendant and to disprove any intent on his part to defraud his creditors by such conveyance, and it appears that the value of the property, which was purchased as a home for his wife and family, was not disproportionate to defendant's then means and was accepted in good faith by his wife without any intent to defraud the creditors of her husband, the gift will be upheld and the complaint dismissed.

Action to charge certain real estate with payment of a judgment against defendant James F. Hooker.

Robert J. Landon, for plaintiff.

Loucks & Alexander, for defendants.

Van Kirk, J.   This is an action to charge certain real estate in the city of Schenectady, paid for by James F. Hooker and deeded to Maude E. Hooker, his wife, with payment of a judgment recovered in January, 1916, by plaintiff against James F. Hooker.   In

and prior to May, 1909, James F. Hooker, the defendant, William H. Proctor, William H. Corser and Charles D. Whittaker were stockholders of the plaintiff, a Vermont corporation. In February, 1909, William H. Proctor brought an action against the defendants here, William H. Corser and Charles D. Whittaker and the Hooker, Corser & Mitchell Company, upon a certain contract dated November 1, 1902, claiming generally that he, a stockholder of the company, was being deprived of his rights under said contract. On May 26, 1909, he filed a supplemental bill, charging that the defendants had planned and conspired to wrong and defraud him and to depreciate the value of his stock in the company and the business thereof, and to violate the said contract and to start another plant for the manufacture of the same kind of goods according to similar patterns, and to sell the same to the customers of the company in place of their goods, and to turn over to said new factory the whole or a large part of the business of the company and to hire away a large part of its salesmen and employees; and, in furtherance of any such plan, they had entered into an agreement to purchase certain lands in Schenectady, N. Y., and to erect thereon a factory and were raising money for the purpose of investing in said business in Schenectady, all to take advantage of and gain benefit from the trade secrets of the company, and had taken certain of the employees of the company familiar with the business thereof, then in the service thereof, to Schenectady to interest them and employ them in the said plant; to furnish trade lists of customers, patterns, designs and private information of the property of the company to the new plant, and to use the private information and knowledge which they, the defendants, had as officers of the company for the benefit of the new plant, and that such plan was being

Supreme Court, March, 1918.        [Vol. 103.

devised and carried out for the purpose of injuring the good will of the company and to take over the same to the new plant. On May 28, 1909, the parties to that action entered into an agreement to settle all the differences of the Hooker, Corser & Mitchell Company and all differences between the stockholders thereof and to stop the litigation. The matters discussed by the parties and their counsel before entering into this agreement, as found by the court in Vermont, were the following:

(a) The matter of obtaining an option on the property in Schenectady by the defendants Hooker, Corser and Whittaker and how far the company was entitled to claim the benefit of that option, Proctor making one claim in reference to it and the defendants making another claim about it, as to just how the company might be affected by that option and what the company's rights were in respect to it;

(b) What would be the action that Hooker, Corser and Whittaker would take with reference to the property and business of the company, as to whether it would be carried on in Brattleboro or be transferred to Schenectady, and just how extensively under certain conditions the defendants would avail themselves of the trade of the company, that they claimed to have established. These were the principal subjects of discussion;

(c) The fidelity of the salesmen of the Hooker, Corser & Mitchell Company to Corser. The subject of whether the defendants Hooker, Corser and Whittaker should engage in the overall manufacturing business in case Proctor bought their stock was also discussed;

(d) The contract of November 1, 1902, and the rights of Proctor on the one hand and the rights of Hooker, Corser and Whittaker on the other hand thereunder.

The settlement took the form of an option on the stock of the company and provided that Whittaker, Hooker and Corser would sell their stock in the company to Proctor for $175 per share, Proctor to have until June 12, 1909, to determine whether he would buy or sell. On May 11, 1909, a deal was closed between Hooker, Corser and Whittaker and parties in Schenectady for lands for the purpose of a factory site. For several years before 1909 the officers of said corporation had been looking about for a suitable place for a branch factory. Hooker, Corser, Whittaker and Proctor had investigated the matter and been to various places looking for a desirable location, but some of the transactions with the parties in Schenectady were unknown to Proctor. Proctor exercised his option on June 10, 1909, and on June fourteenth the stock was transferred. On the same day Hooker, Corser and Whittaker made a contract to erect a factory on the Schenectady property. On June 29, 1909, the Mohawk Overall Company was chartered, with Hooker, Corser and Whittaker stockholders, and shortly thereafter they constructed a plant for the manufacture of overalls. In October, 1909, the Hooker, Corser & Mitchell Company brought an action against James F. Hooker, William H. Corser and Charles D. Whittaker, charging that the defendants had entered into a conspiracy to injure the said corporation and its stockholders, to fraudulently take over to themselves the rights, property and good will of the said company, and asking damages. Plaintiff in that action recovered judgment against the defendants in the sum of $69,000, for damages accruing during the four years 1910, 1911, 1912 and 1913; also for the sum of $1,715, paid by the defendants, while still officers of the company, from the treasury of the company. Judgment was thereupon had in Vermont for $70,715, with inter-

est and costs against the defendants in that action. Action was then brought in the state of New York upon that judgment and judgment was entered in Schenectady county on the 17th day of January, 1916, against James F. Hooker and Charles D. Whittaker. Execution was thereupon issued to the sheriff of Schenectady county, who on the same day returned the execution unsatisfied. The amount of the New York judgment was $59,692.35, a payment of $15,000 on the Vermont judgment having been made. William H. Corser was insolvent in January, 1916, and within two years prior to that time had gone through bankruptcy proceedings.

The Schenectady Realty Company, on August 4, 1909, executed a deed to the defendant Maude E. Hooker of a lot in the city of Schenectady, and on October 26, 1909, executed another deed to her of a lot adjoining the former lot, for which lots defendant James F. Hooker paid the sum of $9,836.20. Upon these lots a dwelling-house was erected between September 15, 1909, and the spring of 1910, the cost of which was paid by the defendant James F. Hooker in the sum of about $20,000. These two lots and the house thereon were a gift to Maude E. Hooker by her husband. At the time they had two children living and the property became the family home. At the time of this gift, James F. Hooker had paid all of his debts in Vermont, except those covered by the Vermont and New York judgments. He was a stockholder of the Mohawk Overall Company, in which he owned $35,000 of stock, par value, for which he paid in cash. He had also considerable other property. The conspiracy found to exist in the Vermont action was entered into prior to this gift, but the only accrued indebtedness existing at that time was $1,715, which he owed jointly with Corser and Whittaker.

Although the conspiracy existed, the damages result-
ing therefrom did not begin to accumulate until 1910.
At the time the gift was made, James F. Hooker had
abundant property to pay all of his known debts and
all damages which had accrued against him, above
the cost of the said lots and the house. In 1915, the
Mohawk Overall Company failed and the defendant
James F. Hooker lost all of his investment therein,
as well as a considerable sum of money which he had
loaned the company. His mother also had made loans
to the company, which she lost. During this period
from 1909 to 1915, the mother of James F. Hooker
had given to him about $40,000. He had also received
from his wife about $10,000, and from a mortgage
which his wife had placed upon this home property
another $10,000.

There was a grant of real property to Maude E.
Hooker for a valuable consideration paid by another,
her husband, James F. Hooker, who was then a debtor.
The grant is presumed fraudulent as against the cred-
itors at the time of James F. Hooker. It is not con-
clusively fraudulent. A question of fact is presented,
with the burden upon Hooker to disprove a fraudu-
lent intent. Real Prop. Law, § 94; *Dunlap* v. *Hawkins,*
59 N. Y. 342; *Colnon* v. *Buckley,* 117 App. Div. 742.
The question of fact and the burden of proof are the
same, if this be considered the usual action to set aside
a conveyance as fraudulent against creditors. Code
Civ. Pro. §§ 1871, 1872; *Ga Nun* v. *Palmer,* 216 N. Y.
603, 611, 612.

The one question necessary to determine is: Has
the defendant James F. Hooker met the burden of
proof resting upon him? Has he disproved a fraudu-
lent intent? A question of actual fraud, not legal
fraud, is presented, and its determination depends
upon the evidence presented, the particular circum-

stances developed, the degree of pecuniary embarrassment resting upon James F. Hooker, his solvency, his realization of his position, and his conduct and use of his property. Intent is an emotion or operation of the mind and can usually be shown only by acts, declarations and circumstances known to the party charged with the intent. If it can be shown that the grantor was in prosperous circumstances and unincumbered and the gift was a reasonable provision, according to his state and condition in life, and leaving enough for the payment of the debts of the grantor, the presumptive evidence of fraud would be met and repelled. *Babcock* v. *Eckler,* 24 N. Y. 630. The plaintiff has produced no direct evidence of fraud or intent to defraud. It has shown the prior relations between Proctor and Hooker, the former litigations and their results and the transactions with regard to the real estate; also a letter written in the summer of 1909 by William H. Proctor to the defendant James F. Hooker, warning him that, if he invested in the Schenectady enterprise, he would do so at his peril. The defendant James F. Hooker has testified that he made the gift to his wife in consideration of love and affection and to make a home for her and her children; that, in making the gift, he had no intent to defraud the plaintiff. He is an interested party and his credibility is a question of fact. Naturally the plaintiff could not directly contradict defendant. Do the disclosed facts tend to corroborate or discredit his testimony? Hooker had promptly paid all his debts when he left Brattleboro after selling his stock, except the debt to the plaintiff. Prior to September, 1909, when he purchased the first plot of ground in Schenectady, he was jointly, with two others, indebted to plaintiff in the sum of $1,715, and had entered into a conspiracy to injure the plaintiff and his business. With

his two codebtors he was guilty of a tort which might result in damages and in 1910 damages began to accrue. During four years, 1910 to 1913, inclusive, damages accrued in the sum of $69,000. In 1909 and until the house was completed in the spring of 1910, Mr. Hooker could not know how much, if anything, he would be indebted on this tort liability. In 1909 and 1910 those codebtors had property and he would naturally expect them to bear a share of the liability. William H. Corser sold his shares in Hooker, Corser & Mitchell Company for $26,250; Charles D. Whittaker sold his shares in the same company for $70,000; and I have found, at the request of the plaintiff, that Whittaker's house in Schenectady cost him $14,000, and other real estate in Schenectady cost him $35,000. Corser and Whittaker each invested in the Mohawk Overall Company stock. Mr. Hooker himself invested $35,000 in cash in this stock and had considerable sums of money in addition thereto. He had sufficient funds to more than pay any known debts existing at the time. He became insolvent in 1915, when the Mohawk Company failed, by which failure he lost, not only the money he had invested in the stock, but considerable sums of money which he had loaned to the company. But neither the intent to defraud, nor the validity of a conveyance attacked, can depend upon subsequent events. The return of an execution in 1916 does not tend to establish insolvency in 1909. *Wadleigh* v. *Wadleigh,* 111 App. Div. 368. It may be that the indebtedness which accumulated under the conspiracy liability in law must be considered to have existed from the date of the conspiracy, or from the time of the first overt act, but in fact it did not exist in any amount, and could not be known, in 1909. Had the indebtedness existed in 1909, the defendants had sufficient means to discharge that indebtedness and it

Supreme Court, March, 1918. ·          [Vol. 103.

is fair to presume that Mr. Hooker knew the financial condition of his associates Whittaker and Corser; at least he knew the amount of money that they had received from the sale of their stock in the plaintiff company. So far as he knew he was solvent in 1909. Insolvency of the debtor is an important fact in connection with his intent to defraud, when he transfers his property without consideration; for a man is presumed to intend the natural consequence of his act. But, if he did not know he was insolvent, his actual insolvency, if it existed, could not have affected his intent. The defendant Hooker testifies that he believed the settlement of the first Vermont action, made in May, 1909, was a settlement of all the differences between him on the one side and the plaintiff and William H. Proctor on the other. The master in chancery in Vermont has found that these differences were not settled; but this is not a finding that Mr. Hooker knew they were not settled; and, when we consider the cause of action stated in the supplemental bill in the first Vermont action and that stated in the second Vermont action, also the subjects which the Vermont court finds were discussed by the parties before the settlement of the first action, also the fact that in that settlement no restrictions was placed upon Hooker, Corser or Whittaker to continue the Schenectady enterprise, or to embark elsewhere in a similar business, Mr. Hooker's testimony that he thought all differences were settled is not improbable. The taking of the stock in the Mohawk Overall Company in his own name, the receiving of funds from his mother and from his wife, and using them in his own name, where they could readily be reached by his creditors, and after receiving the warning letter, is inconsistent with an intent upon his part to defraud his creditors by putting the home in the name of his wife.

Had he intended to keep property from his creditors, he could have safely had the moneys given to him by his mother given to his wife, or he could have used them in his wife's name, and he could have refrained from taking from his wife the $10,000 in securities and the proceeds of the mortgage. The only balance saved by Hooker for his wife in this home is $9,000, there being now a $10,000 mortgage on the home property and he having received from his wife another $10,000; and it may readily be presumed that, if he had not given his money for the home, it would all have gone with the rest of his property at the time of his failure. The evidence seems to me to strongly corroborate the defendant Hooker and to disprove an intent upon the part of James F. Hooker to defraud his creditors by this gift. The value of the home property was not disproportionate to his then means. The gift was a reasonable provision for his family and was accepted in good faith by his wife, without any intent to defraud any creditor of James F. Hooker. It was the duty of the defendant to provide for his family (*Brundage* v. *Munger,* 54 App. Div. 549, 553), and I find that he made the gift of the property in question to make a home for her and the children. A man may legally make a gift of a home to his wife, if at the time he has other property sufficient to pay his debts, and the amount devoted to the home is reasonable in view of his then means. *Guy* v. *Craighead,* 40 App. Div. 260. The complaint should be dismissed.

Complaint dismissed.